UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
D.B. and M.C., individually and on      :
behalf of E.B.,                         :       12 Civ. 4833 (DLC)
                                        :
                    Plaintiffs,         :
        -v-                             :       OPINION AND ORDER
                                        :
NEW YORK CITY DEPARTMENT OF EDUCATION,   :
                                        :
                    Defendant.          :
                                        :
----------------------------------------X

Appearances:

For plaintiffs:

Christina D. Thivierge
Thivierge & Rothberg, P.C.
5 Hanover Square, Suite 1201
New York, NY 10004

For defendant:

Michael A. Cardozo
Eric Porter
New York City Law Department
100 Church Street
New York, NY 10007


DENISE COTE, District Judge:

     Plaintiffs D.B. and M.C. (the "Parents"), on behalf of

their minor child E.B. (the "Student"), bring this action

pursuant to the Individuals with Disabilities Education Act, 20

U.S.C. §§ 1400 et seq. (the "IDEA" or the "Act").[1]  The

---

[1] Congress amended the IDEA by enacting the Individuals with
Disabilities Education Improvement Act of 2004 ("IDEIA"), Pub.

plaintiffs seek review of the April 5, 2012 administrative decision of State Review Officer Justyn P. Bates ("SRO Decision" and "SRO", respectively) annulling the January 10, 2012 decision of Impartial Hearing Officer Mindy G. Wolman ("IHO Decision" and "IHO", respectively) and vacating the IHO's award of reimbursement for the cost of the Student's 2010-2011 educational program.  The plaintiffs move for summary judgment, seeking an order reversing the SRO Decision and reinstating the IHO's award of reimbursement.  Defendant the New York City Department of Education ("DOE") cross-moves for summary judgment, seeking an order upholding the SRO Decision and dismissing the plaintiffs' complaint.  For the reasons set forth below, the DOE's cross-motion for summary judgment is granted and the plaintiffs' motion for summary judgment is denied.


STATUTORY BACKGROUND

      Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . [and] to ensure that

---

L. No. 108-446, 118 Stat. 2647, which took effect on July 1,
2005.  Courts, however, continue to refer to the amended Act as
the IDEA.  Except where noted, the statutory citations in this
Opinion are to the IDEA as amended by the IDEIA.

the rights of children with disabilities and parents of such children are protected."  20 U.S.C. §§ 1400(d)(1)(A) & (B); <u>see also</u> <u>Forest Grove Sch. Dist. v. T.A.</u>, 557 U.S. 230, 239-40 (2009) (discussing the purposes of the IDEA); <u>Winkelman ex rel. Winkelman v. Parma City Sch. Dist.</u>, 550 U.S. 516, 523 (2007) (same).  States receiving federal funding under the IDEA are required to make a free appropriate public education ("FAPE") available to all children with disabilities residing in the state.  20 U.S.C. § 1412(a)(1)(A).  To this end, the IDEA requires that public schools create for each student covered by the Act an individualized education program ("IEP") for the student's education at least annually.  20 U.S.C. § 1414(d)(2)(A).  "[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  <u>Honig v. Doe</u>, 484 U.S. 305, 311 (1988); <u>see</u> <u>M.H. v. New York City Dep't of Educ.</u>, 685 F.3d 217, 224 (2d Cir. 2012) (describing the IEP as "[t]he centerpiece of the IDEA's educational delivery system" (citation omitted)).

In New York City, the DOE is charged with providing a FAPE to all students with disabilities between the ages of three and

twenty-one who reside in the City, and with developing the IEP
for these students by convening local Committees on Special
Education ("CSE").  N.Y. Educ. L. § 4402.  "In developing a
particular child's IEP, a CSE is required to consider four
factors: (1) academic achievement and learning characteristics,
(2) social development, (3) physical development, and (4)
managerial or behavioral needs."  M.H., 685 F.3d at 224
(citation omitted).  The IEP must provide "special education and
related services . . . tailored to meet the unique needs of a
particular child, and be reasonably calculated to enable the
child to receive educational benefits."  Id. (citation omitted).
"[A] school district fulfills its substantive obligations under
the IDEA if it provides an IEP that is likely to produce
progress, not regression, and if the IEP affords the student
with an opportunity greater than mere trivial advancement."
T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d
247, 254 (2d Cir. 2009) (citation omitted).

     The IDEA requires that parents be provided an opportunity
to present a complaint with respect to the identification,
evaluation, or placement of their child through the IEP process.
20 U.S.C. § 1415(b)(6)(A).  Where the parents believe that the
school district has not adequately responded to their
complaints, the IDEA requires that they be given an opportunity

4

to pursue their grievances through an "impartial due process hearing." Id. § 1415(f)(1)(A).  In New York, these hearings are conducted by an IHO, and parties aggrieved by the IHO's decision may appeal to an SRO.  See N.Y. Educ. L. § 4404; 20 U.S.C. § 1415(g)(1) (permitting "any party aggrieved by the findings and decision rendered [by the hearing officer] [to] appeal such findings and decision to the State educational agency").

The IDEA further provides that the final administrative decision may be reviewed "in a district court of the United States" by "bring[ing] a civil action with respect to the complaint."  20 U.S.C. § 1415(i)(2)(A).  The district court is empowered to "receive the records of the administrative proceedings," to "hear additional evidence," and to "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" before it.  Id. § 1415(i)(2)(C); see also Forest Grove, 557 U.S. at 239 (noting that the IDEA "gives courts broad authority to grant 'appropriate' relief").  The IDEA specifically contemplates that "when a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education."  Forest Grove, 557 U.S. at 232; see 20 U.S.C. § 1412(a)(10)(C).

5

FACTUAL BACKGROUND

The following facts are taken from the parties' submissions and the underlying administrative record, and are undisputed unless otherwise indicated. Plaintiffs D.B. and M.C. are the father and mother, respectively, of the Student. At the onset of the 2010-2011 school year, which is at issue in this case, the Student was twelve years old. The Student is classified as a student with autism and is a "child with a disability" under the IDEA. See 20 U.S.C. § 1401(3)(A)(i).

A. The CSE Meeting and the Student's IEP

On May 21, 2010, a CSE was convened to develop an IEP for the Student for the 2010-2011 school year. At the time, the Student was unilaterally enrolled in Celebrate the Children ("CTC"), a private special education school. The CSE consisted of M.C., the Student's mother;[2] representatives from the DOE, including Rose Fochetta ("Fochetta"), a certified school psychologist with a masters in educational psychology; Jane O'Connor, a special education teacher who also served as the DOE representative at the CSE; Sharon Wechsler, a general education teacher; Monica Osgood, the CTC Executive Director; and a number

---

[2] It is unclear from the parties' submissions whether both Parents participated in the CSE meeting, or if only M.C. was present.

of E.B.'s then-current teachers and service providers at CTC,
including Elizabeth Kali, E.B.'s occupational therapist; Alyssa
Golden, E.B.'s speech therapist; Danielle Dieckmann, E.B.'s
physical therapist; and Desmond Lloyd, E.B.'s 1:1
paraprofessional (collectively, "CSE Members").[3]

The CSE Members principally utilized "teacher estimates,"
information from the Student's then-current teachers and service
providers at CTC, to formulate the Student's IEP.  The CSE also
reviewed a number of additional reports documenting the
Student's abilities, including his 2009-2010 IEP, various
progress reports from 2010, and a psychological evaluation from
2007.  No new tests were conducted.  Based on the considered
evaluative data, the CSE determined that the Student functioned
at a kindergarten level, which was reflected in the Student's
IEP.  All the CSE Members agreed with the descriptions of the
Student's performance levels at the time, including M.C.

The CSE also developed E.B.'s educational and behavioral
goals and objectives for the 2010-2011 school year.  The final
IEP contained approximately twenty-six goals and eighty-four
short-term objectives, such as rhyming words and identifying
sounds, matching shapes and coins, and extending simple

---

[3] The CSE Members from CTC participated by telephone; all others
attended in person.

patterns.  All of the goals and objectives were reviewed at the CSE meeting; each CSE Member, including M.C., agreed on the goals' and objectives' suitability for E.B. and capacity for implementation in a public school.

B. The Student's Recommended Placement for the 2010-2011 School Year

The final IEP for the 2010-2011 school year recommended placing the Student in District 75,[4] in a specialized class with a student-to-teacher-to-paraprofessional ratio of six-to-one-to-one ("6:1:1"), and assigning to E.B. a one-to-one ("1:1") full-time crisis management paraprofessional (together, "6:1:1 + 1:1").  The IEP also recommended that each week the Student receive four thirty-minute sessions of occupational therapy ("OT"), two thirty-minute sessions of physical therapy ("PT"), four thirty-minute sessions of individual speech/language ("S/L") therapy, and two thirty-minute sessions of individual counseling.

The DOE issued a Final Notice of Recommendation ("FNR") to the Parents on June 8, 2010, which briefly described the DOE's proposed classroom program and school placement.  The FNR placed the Student at P94M at 188M ("P94"), a special education school at which the Student's recommended 6:1:1 + 1:1 program with

_____

[4] District 75 is New York City's district of full-time special education schools.

related services would be implemented.  The Parents also received a copy of the IEP via mail.

### C. The Student's Unilateral Placement for the 2010-2011 School Year

On June 22, M.C. visited P94 and observed two classrooms that the DOE offered as suitable placements for the Student. The first class was a fifth and sixth grade classroom, which M.C. described as containing students who were "severely impaired and nonverbal."  The second class was a third and fourth grade classroom, which M.C. felt contained students functioning at levels that surpassed E.B.'s.  M.C. also expressed dissatisfaction with the cafeteria and sensory gym at P94.  As a result, M.C. came to believe that the recommended placement was inappropriate for the Student.

By letter dated June 22, M.C. timely rejected the DOE's proposed placement at P94, and stated that the Student would continue his education at CTC.  At CTC, the Student was placed in a classroom with a ratio of ten children to one teacher and six classroom paraprofessionals.  The Student attended CTC on a limited basis from September through December 2010, while also receiving approximately twenty-two hours of programming per week from the Communication Clinic of Connecticut ("CCC").[5]  The

---

[5] The DOE claims that, of the twenty-two hours, the Student traveled over two hours to attend the CCC clinic one day per

Student's program at CCC taught him language skills and functional living skills, including personal grooming, cooking, and cleaning.[6]   The Student also received supplemental services such as social and emotional therapy, supervision, parent training, communication therapy, S/L therapy, language development therapy, and relationship development intervention contemporaneously with his CCC programming ("Supplemental Services").

The plaintiffs contend that E.B.'s CCC program helped him feel competent and motivated.  As a result, in January 2011, the Parents removed E.B. from CTC and placed him in the CCC program full-time.  The Student received CCC services at home two days per week and attended the CCC clinic three days per week.  The plaintiffs contend that by the end of the 2010-2011 school year, the Student had progressed in all areas and his problem behaviors were significantly reduced.

D. The IHO Proceedings and Decision

---

week, and received CCC services at his home on Mondays and Fridays.

[6] The parties disagree as to the amount of academic instruction provided by CCC.  The plaintiffs assert that academic content was "embedded" throughout the Student's activities at CCC; the DOE, however, claims that only two hours per week were reserved for educational instruction.  The DOE also contends that CCC educational instruction was primarily 1:1.

On July 2, 2010, the plaintiffs requested services under pendency and an impartial due process hearing (the "Hearing") to address the DOE's alleged failure to provide the Student a FAPE and to obtain tuition reimbursement for the cost of tuition at CTC and any Supplemental Services provided during the 2010-2011 school year.[7]   On October 13, the plaintiffs amended their Due Process Complaint to withdraw their request for pendency services ("Amended Due Process Complaint").   The hearing was conducted before the IHO in eight sessions held between August 2010 and November 2011.

The six-page IHO Decision was rendered on January 10, 2012.[8] The IHO held that the DOE had failed to offer the Student a FAPE for the 2010-2011 school year.  In particular, the IHO found that the CSE relied on out-of-date and insufficient evaluative information in developing the IEP, which rendered inaccurate the CSE's assessment of the Student's present levels of performance. The IHO also found that the goals and objectives in the Student's IEP were inappropriate and that many of the stated goals exceeded the Student's then-current skill level, which

_____

[7] Upon the Student's transfer to CCC, the parties consented to amend the relief sought from the cost of tuition at CTC, as initially requested, to reimbursement for the cost of tuition at CCC and the additional services the Student received.

[8] The IHO issued a Corrected Findings of Fact and Decision on January 11, 2012.

could result in negative, even aggressive, responses.  Finally,
the IHO concluded that the DOE did not establish the suitability
of the proposed 6:1:1 + 1:1 program for the Student, as it was
unclear to the IHO whether the program would have provided the
Student with sufficient individualized instruction.  The IHO
Decision did not address whether the CSE had conducted a
Functional Behavioral Assessment ("FBA") or had provided the
Student's Behavior Intervention Plan ("BIP") to the Parents, or
whether the proposed school placement at P94 was appropriate.

The IHO Decision also found that the unilateral placement
of the Student at CCC had been appropriate, and that equitable
considerations supported the plaintiffs' claim for tuition
reimbursement because the Parents cooperated during the
formulation of the Student's IEP and because M.C. visited the
Student's recommended placement to determine its
appropriateness.  As a result, the IHO ordered the DOE to
reimburse the Parents for the Student's tuition at CCC, as well
as for Supplemental Services rendered from July 1, 2010 through
June 30, 2011.

E. The SRO Appeal and Decision

The DOE appealed the IHO Decision on February 3, 2012.  The
plaintiffs did not cross-appeal any aspect of the IHO Decision.
The SRO reviewed the Student's IEP and the documentary and

12

testimonial evidence introduced at the Hearing.  The twenty-one page SRO Decision dated April 5, 2012 reversed the IHO Decision and determined that the DOE had offered the Student a FAPE for the 2010-2011 school year.  The SRO determined that the IHO had erred in finding that the DOE's failure to conduct a current reevaluation of the Student was a procedural defect and that the evaluative data on which the CSE Members based the IEP was insufficient.  The SRO carefully examined both the "teacher estimates" and the additional documentation that had been examined by the CSE in formulating the Student's IEP and found that, together, they formed a sufficient basis for the CSE to assess accurately the Student's present skill levels.

The SRO Decision also held that the IHO's analysis of the goals and objectives contained in the Student's IEP was poorly reasoned, since it inter alia offered no specifics as to which goals were unsuited to the Student.  After a careful review of the Hearing record, the SRO found the goals and objectives were appropriate, overturned the IHO's finding that the recommended placement was improper, and approved the 6:1:1 + 1:1 program that the IEP had proposed.  The SRO therefore held that the Hearing record supported findings that the IEP was well-suited to meet the Student's needs and that the IHO erred in determining that the DOE had failed to provide the Student a

FAPE.  As a result, the SRO denied the Parents' request for tuition reimbursement.

Because the plaintiffs did not file a cross-appeal, the SRO limited the scope of his review to those issues that the IHO Decision had addressed: the sufficiency of the evaluative data used to formulate the Student's IEP, the accuracy of the present levels of performance in the IEP, the adequacy of the goals and objectives in the IEP, and the adequacy of the CSE's recommendation to place the student in a 6:1:1 + 1:1 special class.  As the SRO found that the DOE had provided the Student a FAPE for the 2010-2011 school year, the SRO did not continue his analysis to consider the appropriateness of the Student's unilateral placement at CTC and CCC, or equitable considerations.

F. The District Court Proceedings

On June 20, 2012, the plaintiffs timely filed the complaint in this action seeking review of the SRO Decision.  On December 14, the plaintiffs filed their motion for summary judgment, and on January 18, 2013, the DOE filed its cross-motion for summary judgment.

14

LEGAL STANDARD

Although the parties have styled their submissions as
motions for summary judgment, "the procedure is in substance an
appeal from an administrative determination, not a summary
judgment." Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,
397 F.3d 77, 84 n.3 (2d Cir. 2005) (citation omitted).  As such,
summary judgment in IDEA cases "often triggers more than an
inquiry into possible disputed issues of fact." Id. at 83 n.3.
Rather, the court conducts an "independent" review of the
administrative record, basing its decision on the "preponderance
of the evidence." Bd. of Educ. of Hendrick Hudson Central
School Dist., Westchester County v. Rowley, 458 U.S. 176, 205
(1982) (citation omitted).  Summary judgment thereby "serves as
a pragmatic procedural mechanism for reviewing a state's
compliance with the procedures set forth in IDEA." Lillbask,
397 F.3d at 83 n.3 (citation omitted).

Nevertheless, "the role of the federal courts in reviewing
state educational decisions under the IDEA is circumscribed,"
T.Y. & K.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ., 584 F.3d
412, 417 (2d Cir. 2009) (citation omitted), and "courts may not
substitute their own notions of sound educational policy for
those of the school authorities which they review." Id.
(citation omitted).  "While the district court must base its

decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. (citation omitted). "The deference paid to administrative proceedings is particularly warranted where . . . the district court's decision [is] based solely on the administrative record." A.C. & M.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009). The court should "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." Id. (citation omitted). Judicial deference to the administrative proceedings "is particularly appropriate when the state officer's review has been thorough and careful[.]" R.E. v. New York City Dep't of Educ., 694 F.3d 167, 184 (2d Cir. 2012) (citation omitted). In cases where "the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.'" A.C., 553 F.3d at 171 (citation omitted).

When a state receiving federal funding for special education fails to give a disabled child a FAPE under the IDEA, the child's parents or guardians may unilaterally place the child in an appropriate private school and seek tuition

reimbursement from the state.  See Sch. Comm. of Burlington,
Mass. v. Dep't of Educ., 471 U.S. 359, 369-70 (1985)
("Burlington"); Florence County Sch. Dist. Four v. Carter ex
rel. Carter, 510 U.S. 7, 12 (1993) ("Carter").  Under the
Burlington-Carter test for tuition reimbursement, plaintiffs are
entitled to reimbursement of private school tuition if (1) the
IEP was not "reasonably calculated to enable the child to
receive educational benefits," (2) "the private schooling
obtained by the parents is appropriate to the child's needs,"
and (3) equitable considerations support the plaintiffs' claim.
T.Y., 584 F.3d at 417 (citation omitted); see also Forest Grove,
557 U.S. at 246-47 ("Parents are entitled to reimbursement only
if a federal court concludes both that the public placement
violated IDEA and the private school placement was proper under
the Act . . . [a]nd even then courts retain discretion to reduce
the amount of a reimbursement award if the equities so warrant .
. . ." (citation omitted)).


DISCUSSION

     While the IHO and SRO reached conflicting conclusions as to
whether the DOE offered the Student a FAPE, the SRO Decision is
careful and detailed in its analysis of the plaintiffs' claims
and, accordingly, warrants deference.  The IHO presented little,

17

if any, analysis of the administrative record and controlling
law to support her summary assertions that the DOE failed to
meet its burden in showing that the Student's IEP was
procedurally and substantively appropriate.  By contrast, as
described in greater detail below, the SRO Decision examined the
full evidentiary record and detailed its careful reasoning in
deciding that the IHO had erred.

A. Scope of Review

As a preliminary matter, the DOE contends that the
plaintiffs are barred from litigating several issues raised in
their summary judgment motion because the plaintiffs either
failed to mention them in the Amended Due Process Complaint or
failed to raise them in a cross-appeal from the IHO Decision to
the SRO.  First, the plaintiffs seek to challenge (i) the DOE's
failure to conduct an FBA for the Student[9] and (ii) the
substantive adequacy of the BIP as part of their argument that
the Student's IEP was procedurally and substantively deficient.
These two issues, however, were not raised in plaintiffs'
initial or amended Due Process Complaints.  The scope of the
inquiry of the IHO, and therefore also of the SRO and this
Court, is limited to matters either raised in the plaintiffs'

_____

[9] As previously described, an FBA provides detailed information
about a student's problem behaviors.

Amended Due Process Complaint or agreed to by the defendant. 20 U.S.C. § 1415(f)(3)(B); see also Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 245 (2d Cir. 2008) ("Failure to exhaust the [IDEA's] administrative remedies deprives the court of subject matter jurisdiction."). The DOE has made no such agreement here. The Parents may not now rely on objections that were not included in their Amended Due Process Complaint, and the Court thus will not consider those challenges here.

The plaintiffs also seek in their summary judgment motion to challenge (i) the DOE's failure to include a BIP for the Student in the IEP and (ii) the appropriateness of the DOE's proposed placement at P94. While there is no dispute that these two issues were properly raised in the plaintiffs' Amended Due Process Complaint, the DOE argues that the plaintiffs have waived their right to rely on these arguments at this stage because the IHO did not address them in the IHO Decision, and the plaintiffs did not cross-appeal the IHO's non-consideration of the issues to the SRO.

The plaintiffs' claims regarding the absence of a BIP and the proposed P94 school placement are properly raised here. Federal and state law require parties in IDEA proceedings to appeal only to the extent that they are "aggrieved" by all or a portion of an IHO's decision. See 20 U.S.C. § 1415(g)(1); N.Y.

19

Comp. Codes R. & Regs. tit. 8, § 200.5(k)(1).  Parties that
receive their requested relief in proceedings are not
"aggrieved."  See Antkowiak by Antkowiak v. Ambach, 838 F.2d
635, 641 (2d Cir. 1988); see, e.g., J.F. v. New York City Dep't
of Educ., No. 12 Civ. 2184 (KBF), 2012 WL 5984915, at *9
(S.D.N.Y. Nov. 27, 2012) (noting that the term "aggrieved" is
interpreted by its ordinary meaning, which implies actual harm
or injury).  As such, parties that succeed in an IDEA proceeding
before an IHO are under no obligation to appeal any aspect of
the hearing officer's favorable decision.

     Here, the IHO made no findings regarding the DOE's
development of a BIP or its inclusion in the Student's IEP, or
regarding the recommended school placement at P94.  Instead, the
IHO determined that the DOE failed to offer the Student a FAPE
based on other considerations, including the inaccuracy of the
DOE's assessment of E.B.'s skill levels and the
inappropriateness of a 6:1:1 classroom for the Student.  Because
the IHO ultimately ruled in favor of the plaintiffs and awarded
them reimbursement, the plaintiffs were not aggrieved by the IHO
Decision.  As a non-aggrieved party, the plaintiffs' failure to
cross-appeal issues properly raised in their Amended Due Process
Complaint but never reached by the IHO does not constitute a
waiver of their right to pursue those issues here.

In any event, while the SRO indicated that his review was
limited to only those issues addressed by the IHO and appealed
by the DOE, he did not wholly exclude the plaintiffs' arguments
regarding the BIP and P94 in his analysis.[10]  The SRO's
consideration of these issues further supports the finding that
these issues are ripe for review.

   B. The IEP Did Not Suffer From Procedural Defects that
      Denied the Student a FAPE.

The first consideration in determining whether the Parents
are entitled to tuition reimbursement is to ask "whether the
state has complied with the procedures set forth in the IDEA"
and "whether the IEP developed through the Act's procedures is
reasonably calculated to enable the child to receive educational
benefits."  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192
(2d Cir. 2005) (citation omitted).  This "initial procedural
inquiry in an IDEA case is no mere formality, as adequate
compliance with the procedures prescribed would in most cases
assure much if not all of what Congress wished in the way of
substantive content in an IEP." A.C., 553 F.3d at 172 (citation
omitted).  At the same time, "it does not follow that every

---

[10] Although not determinative of the SRO's finding that the DOE
provided the Student a FAPE, the SRO Decision describes in a
footnote that "[t]he hearing record reflects that the May 2010
CSE also developed the [S]tudent's BIP," and considers both the
services provided for the Student at P94 and the Hearing
testimony of a P94 special education teacher.

procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003). Rather, a procedural violation will constitute a denial of a FAPE "only if the procedural inadequacies (i) impeded the child's right to a free appropriate public education; (ii) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (iii) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

      1. Sufficiency of Evaluative Data

The first alleged procedural deficiency of the Student's IEP is that the CSE had insufficient information to evaluate accurately the Student's present levels of performance. In particular, the plaintiffs contend that the CSE improperly considered outdated formal testing and relied on inadequate "teacher estimates" in the development of the IEP.

Federal and state regulations require a district to conduct an evaluation of students receiving special education or related services at least once every three years unless the parents and the district agree otherwise. See 20 U.S.C. §1414(a)(2)(B). In developing an IEP, a CSE is directed to "review existing evaluation data on the child, including -- (i) evaluations and

information provided by the parents of the child; (ii) current
classroom-based, local, or State assessments, and classroom-
based observations; and (iii) observations by teachers and
related services providers."  Id. § 1414(c)(1)(A).  "[O]n the
basis of that review," a CSE must then "identify what additional
data, if any, are needed to determine," among other things, "the
present levels of academic achievement" of a student.  Id.
§ 1414(c)(1)(B).  Any additional assessments need only be
conducted if found necessary to fill in gaps in the initial
review of existing evaluation data.  Id. § 1414(c)(2).

The IHO and SRO both directly addressed this alleged
deficiency.  The IHO found that the DOE had failed to conduct
its mandatory evaluation of the Student within the past three
years, and that the "teacher estimates" on which the CSE relied,
"without more, do not form a sufficient and appropriate basis
for developing an[] IEP."  The SRO carefully considered the full
evidentiary record in determining that the IHO's findings were
in error on this issue.  The SRO first concluded that the fact
that the DOE failed to conduct a current reevaluation of the
Student did not deny the Student a FAPE.  He then found that the
CSE had sufficient information to formulate the Student's
present levels of performance in the IEP.  In making this
determination, the SRO engaged in a thorough review of each of

23

the reports and evaluations that the CSE used to assess the Student's abilities, in addition to the "teacher estimates," and considered in detail any conflicting testimony presented at the hearing.

The SRO's careful assessment of both the record and controlling law is entitled to deference. Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998). The SRO was correct in finding that, in creating the Student's IEP, the CSE relied on "teacher estimates," information from the Student's then-current teachers and service providers at CTC, as well as a number of other reports evaluating E.B.'s abilities as recently as March and May 2010. These additional materials included E.B.'s IEP from the previous 2009-2010 school year; a 2010 OT report; a 2010 mental health progress report; a 2010 formal progress report from CTC; and the last formal DOE evaluation of the Student that was conducted in 2007. These materials described in detail the Student's reading, writing, and math functioning levels. They were reviewed and discussed at the CSE meeting by staff from CTC, the Student's 1:1 paraprofessional, speech, physical, and occupational therapists, Fochetta, and M.C. herself.

The SRO correctly found that this evaluative data was more than sufficient for the CSE properly to develop the Student's

IEP and did not deny the Student a FAPE.  There is no evidence
in the record that any CSE Member, including M.C., believed that
this information was inadequate at the time or otherwise needed
to be supplemented by additional evaluations or any new formal
testing.  Not even M.C. testified that the information she and
the CTC supplied failed to provide a sufficient basis for the
CSE properly to determine the Student's level of academic
achievement.  The plaintiffs also provide no support for their
assertion that the teacher estimates were insufficient and
served as a "shortcut" to determining the Student's present
level of academic performance, citing only to the IDEA's
requirement that a district must use a "variety of assessment
tools and strategies" in developing a student's IEP.  20 U.S.C.
§ 1414(b)(2)(A); 34 C.F.R. § 300.304(b)(1)(ii).

While it is undisputed that the DOE had not evaluated the
Student since February 2007, the SRO also correctly found that
the failure of the DOE to conduct the statutorily-mandated
psychological reevaluation of the Student does not render the
IEP procedurally defective in this case.  The purpose of the
formal evaluation is to "provide relevant information that
directly assists persons in determining the educational needs of
the student."  8 N.Y.C.R.R. 200.4(b)(6)(i)(d)(xi).  The
information provided at the CSE meeting more than fulfilled that

purpose, and there is no evidence that the absence of any post-2007 formal DOE evaluation impeded the Student's right to a FAPE or denied the Student or Parents any educational or procedural opportunities.  See 20 U.S.C. § 1415(f)(3)(E)(ii); Grim, 346 F.3d at 381.[11]  Moreover, the statute clearly indicates that a CSE's evaluation of a student's abilities should never rely on "any single measure or assessment as the sole criterion for determining . . . an appropriate educational program for the child."  20 U.S.C. § 1414(b)(2)(B).  By the same token, where, as here, the CSE relied on a number of sufficient evaluations, reports, and observations in assessing the Student's skill levels, the absence of one "single measure" should not itself render an IEP invalid.  In this case, the preponderance of the evidence indicates that the CSE had sufficient and accurate information to understand the Student's present levels of performance in preparing the IEP.

　　　2. The Student's Levels of Performance

　　　The plaintiffs next allege that the IEP's determination that the Student performed at a kindergarten level was inaccurate.  The Parents claim that the Student was functioning at a lower, pre-kindergarten level ("pre-K") at the time,

---

[11] It is therefore also of no consequence whether the DOE could have tested the Student at any time since 2007.

pointing to an evaluation conducted after the CSE meeting by Dr.
Nancy Schwartz ("N. Schwartz"), the director of CCC, which
placed the Student at a two-year old skill level,[12] and the
Hearing testimony of N. Schwartz and Dr. Caley Schwartz ("C.
Schwartz"), a clinical psychologist who had worked with the
Student, to support their contention.

The IHO and SRO both addressed this argument directly.
Relying solely on her determination that the evaluative data on
which the CSE based its assessment of the Student's abilities
was insufficient and inappropriate, the IHO broadly found that
the "IEP did not, therefore, accurately set forth E.B.'s present
levels of performance and learning characteristics."  The SRO
overturned the IHO's conclusion after making specific findings
with respect to N. Schwartz's testimony and the sufficiency of
the evaluative data, and ultimately determined that nothing on
the record renders the Student's IEP invalid or inaccurate.

This Court has already found that the extensive
documentation and verbal input that the CSE Members used to
formulate the Student's IEP provided the DOE with more than
enough current information to assess accurately the Student's
skill levels.  There is also evidence that every CSE Member,

---

[12] N. Schwartz first evaluated the Student at the end of July
2010; the CSE meeting occurred on May 21, 2010.

including M.C., participated in and contributed to the discussion of, and ultimately agreed with, the descriptions of the Student's academic skills at the time.[13]

The SRO Decision also warrants deference here.  The SRO extensively engaged with the evidence in the administrative record regarding E.B.'s levels of performance, and reasonably cast doubt on the methodology N. Schwartz used in her post-CSE meeting evaluation of the Student.  The SRO found that "it is unclear why [N. Schwartz] began her assessment of the [S]tudent at an eight year old level," and that when faced with testing at that higher level, it was thus "not surprising that the [S]tudent responded by demonstrating inappropriate behaviors." He further attributed N. Schwartz's disagreement with the academic performance levels set forth in the Student's IEP to a "genuine difference of opinion regarding the best way to instruct th[e] [S]tudent and address his complex needs," and reasonably held that it was appropriate to rely on the information available to the CSE Members at the CSE meeting in describing the Student's levels of academic achievement and functional performance.

---

[13] While M.C. testified at the Hearing that she did not understand what a "kindergarten level" meant, she nonetheless agreed with the descriptions of the Student's academic and functional skill levels at the time of the CSE meeting.

The plaintiffs assert that the Court should not defer to the SRO Decision because the SRO improperly found that there was little difference between assessing the Student at a pre-K versus a kindergarten level.  The SRO, however, neither assumed nor found that pre-K and kindergarten levels are indistinguishable in general.

Instead, the SRO Decision reasoned that any difference in characterizing the Student at a pre-K or kindergarten level on the Student's IEP would not affect the IEP's utility in properly guiding appropriate instruction for the Student and did not deny the Student a FAPE.  The SRO based this finding on a consideration of the sufficiency of the information provided at the CSE Meeting, as well as the IEP's allowance for teacher support, the Student's age, and the severity of his disability. The SRO Decision also explored N. Schwartz's testimony and found that N. Schwartz evaluated and addressed needs similar to those reflected in the Student's IEP.  In light of these factors, the SRO determined that either characterization would afford the Student the same type of academic instruction in this case. Nothing calls into question the SRO's carefully considered determination that the Student's level was not incorrectly reported.  Nor did the CSE Members in this case arbitrarily assign or change the Student's performance levels based on

information unrelated to the CSE's assessment of the Student or ever come to determine that the kindergarten level was inaccurate.  See M.H., 685 F.3d at 248.  The SRO was thus correct in determining that the Student's classification at a kindergarten level does not render the IEP insufficient.

   3. Absence of the BIP

  The plaintiffs also allege that the Student's IEP was procedurally inadequate because it did not include a BIP, or Behavior Intervention Plan.  A BIP typically consists of four sections in which the CSE describes: (1) the behaviors that interfere with the student's learning, (2) the behavioral changes expected of the student, (3) the strategies used to help the student make those changes, and (4) the supports employed to help the student make those changes.  The plaintiffs claim that they did not receive a copy of the Student's proposed BIP in the IEP that was sent to them, and that they only received it during the Hearing.  They contend that this belated receipt demonstrates a denial of a FAPE.  This alleged deficiency was not addressed by the IHO.  As previously noted, the SRO did not address the plaintiffs' argument regarding when they received the BIP, but did assert in a footnote that the CSE had developed a BIP for the Student.

A BIP must be developed when "the student exhibits persistent behaviors that impede his or her learning or that of others."  N.Y. Comp. Codes R. & Regs. tit. 8 § 200.22(b); see R.E., 694 F.3d at 190.  As the SRO indicated, the record is replete with evidence that a BIP was properly developed at the CSE meeting, and contained strategies outlining how to deal with the Student's problem behaviors.  Fochetta testified that a BIP was drafted by hand at the CSE meeting and then later included in the Student's IEP.  When asked at the Hearing whether it was clear that a BIP was discussed at the CSE meeting, Fochetta testified that, "I can't understand how . . . there would be any confusion with regard to that."  While M.C. did not recall specifically discussing a "BIP" at the CSE meeting, she nevertheless agreed that the CSE Members discussed E.B.'s behaviors and how they were best approached at school and decided "what services [E.B.] would need and what -- would be appropriate."

In any event, whether or not the plaintiffs only received a copy of the BIP at the Hearing, there is no indication that this denied the Student a FAPE.  It is clear that M.C. fully participated in the CSE's decision-making process to find strategies that would address the Student's problem behaviors to

31

include in the IEP.[14]  There is also no evidence that the timing
of the Parents' receipt of the BIP that had been developed with
their input interfered in any way with the Parents' involvement
in the CSE or with the Student's ability to receive educational
benefits.  20 U.S.C. § 1415(f)(3)(E)(ii).

In sum, given M.C.'s significant involvement in developing
the Student's special education plans and the sufficiency of the
information before the CSE to assess the Student's academic,
functional, and behavioral capacities, the IEP satisfied the
IDEA's procedural obligations.  See Cerra, 427 F.3d at 193-94.
There is no indication that the Parents were denied any
meaningful opportunity to participate in the formulation of
E.B.'s IEP or that the CSE's process of developing the IEP in
any way denied E.B. educational or other benefits.

C. The IEP Was Not Substantively Inadequate Under the IDEA.

"The purpose of the [IDEA] was more to open the door of
public education to handicapped children on appropriate terms

---

[14] In this way, the plaintiffs' attempt to analogize any delayed
receipt of the BIP to "retrospective testimony" addressing
services that could have been provided to the Student beyond
what was written in the Student's IEP, which a court may not
consider at this stage, see R.E., 694 F.3d at 185-86, is not
persuasive.  The record here indicates that a BIP was developed
at the CSE based on input from all CSE Members, and that any BIP
that the Parents received for the first time at the Hearing was
thus neither intended to "overcome deficiencies in the IEP" nor
materially different from information contained in the IEP.  See
id. at 185.

than to guarantee any particular level of education once inside." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 130 (citation omitted).  Therefore, the IDEA does not require that an IEP furnish "every special service necessary to maximize each handicapped child's potential." Rowley, 458 U.S. at 199. Rather, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." T.P., 554 F.3d at 254 (citation omitted); see also Cerra, 427 F.3d at 195.  A school district's program must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." Walczak, 142 F.3d at 122 (citations omitted).

"[B]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." T.Y., 584 F.3d at 418 (citation omitted).  "[I]n order for the district court to conduct an independent review of the sufficiency of an IEP under the IDEA that does not impermissibly meddle in state educational methodology, it must examine the record for objective evidence that indicates whether

the child is likely to make progress or regress under the
proposed plan." Gagliardo v. Arlington Cent. Sch. Dist., 489
F.3d 105, 113 (2d Cir. 2007) (citation omitted). "[T]he
sufficiency of goals and strategies in an IEP is precisely the
type of issue upon which the IDEA requires deference to the
expertise of the administrative officers." Grim, 346 F.3d at
382.

The Student's IEP satisfies all the requirements under the
IDEA and the law of this Circuit. The record supports a finding
that the DOE properly tailored the Student's IEP to suit his
needs, and was based on and incorporated the detailed
evaluations, observations, and other information provided by the
Parents and other CSE Members, and as a result, an educational
benefit would have been conferred. The plaintiffs challenge the
substantive adequacy of the IEP's goals and objectives, as well
as the 6:1:1 + 1:1 program and its implementation at P94, and
argue that the IEP therefore is not reasonably calculated to
enable the Student to receive educational benefits. Their
arguments, however, are unavailing and will be addressed in
turn.

1. IEP Goals and Objectives

While the plaintiffs fail to identify the specific goals
included in the Student's IEP that they consider to be

34

inappropriate, the plaintiffs nonetheless allege that the
proposed goals were not functional, were too challenging for the
Student, and did not contain appropriate "mastery criteria,"
which would have aimed to increase E.B.'s independence.  The IHO
and SRO both directly considered this alleged substantive
deficiency.

The IHO did not provide any detailed explanation for her
findings, but instead baldly asserted that the DOE's testimony
was insufficient to establish that the goals contained in the
Student's IEP were appropriate.  The IHO also determined that
many of the goals were above the Student's then-current skill
level, but did not indicate which goals she found to be too
advanced.  The SRO, by contrast, reviewed in detail several of
the goals and objectives set forth in the Student's IEP, as well
as the broader skill areas they sought to improve.  The SRO
Decision considered the underlying focus of the IEP's goals and
objectives, and their relation to the record evidence provided
by the Student's then-current teachers and related service
providers at CTC, and found that they emphasized improving
academic and social skills.  These skills had similarly been the
emphasis of the Student's instruction at CTC.

The SRO found that the program at CCC was focused on a
different set of underlying principles aimed at improving the

Student's functional living skills.  The SRO concluded that just because "the focus of intervention at CCC differed from that employed by CTC and appropriately utilized by the May 2010 CSE does not result in a denial of FAPE."  In light of all these considerations, the SRO found that the goals and objectives described in the Student's IEP were appropriate.

The SRO's careful assessment of the record is entitled to deference.  The IDEA provides that an IEP must have

> A statement of measurable annual goals, including academic and functional goals, designed to --
> (aa) Meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and
> (bb) Meet each of the child's other educational needs that result from the child's disability.

20 U.S.C § 1414(d)(1)(A)(i)(II).  The SRO was correct in determining that those requirements were met.  The hearing record reflects the appropriateness of the twenty-six goals and eighty-four short-term objectives contained in the IEP.  There is substantial evidence that these goals and objectives were specifically developed to address the Student's particular needs.  While some of the goals and objectives were prepared in advance of the meeting by the Student's then-current teachers and service providers, some of the goals were developed at the CSE meeting, and all of the goals were reviewed at the meeting by all CSE Members, including M.C., who agreed on their

suitability for E.B. and capacity for implementation in a public school.  M.C. specifically contributed to their development, requesting an additional self-help annual goal, which was indeed added to the IEP.

The SRO also considered that while N. Schwartz claimed that some of the IEP's stated goals may have been too challenging for the Student, she agreed with many of the basic principles the goals sought to target, including improving the Student's handwriting and functional skills, and ability to match coins and identify letters.  N. Schwartz also acknowledged that, in her evaluations of the Student, the Student had at times correctly demonstrated skills targeted in the IEP's goals and objectives, including 1:1 correspondence, counting to ten, and functioning at a "reading readiness" level -- all of which were included in the IEP.  The SRO thus reasonably concluded that the goals and objectives were properly tailored to benefit the Student.[15]

The plaintiffs also question the appropriateness of the proposed goals and objectives' mastery criteria.  They argue

---

[15] The plaintiffs' claims that the goals and objectives are too advanced because they were based on an incorrect assessment of the Student's present level of performance are also not persuasive in light of the Court's prior determination that the IEP appropriately described the Student to function at a kindergarten level.

that the goals should have sought to target the Student's
independence, which would help E.B. to master the proposed goals
on his own, rather than require the use of moderate support,
including visual or verbal prompting, which the plaintiffs
believe hinder the Student's development.  The SRO, however,
reasonably found that it was not inappropriate for the IEP to
include supports within the goals and objectives.  The SRO
Decision carefully considered testimony from the Hearing that
suggested that the amount of support included in the Student's
goals could affect E.B.'s ability to perform functional skills
on his own.  He ultimately reasoned, however, that the supports
were important for the Student's academic and social skill
development, which the Student's CTC program had stressed as
important for the Student, and had served as the foundation for
the CSE's development of the IEP.  Based on the Student's
present abilities, the IEP's reasonable goals, and evidence
demonstrating that supports would allow the Student to advance
in academic and social realms, the SRO's conclusion as to the
sufficiency of the IEP's goals and objectives warrants
deference.

      2. 6:1:1 + 1:1 Program

    The plaintiffs next argue that the 6:1:1 + 1:1 program
recommended for the Student was not appropriate because the

Student required more individualized instruction in order to
make gains.  Both the IHO and SRO discussed this challenge to
the IEP's substantive sufficiency.  The IHO, however, did no
more than summarily state that "[t]he 6:1:1 program would not
have provided [the Student] with the level of [individualized]
support that he needed."  The SRO, however, found that the IHO
had erred by ignoring evidence of the instructional value of the
recommended 1:1 crisis management paraprofessional and other
related services that formed a part of the Student's proposed
6:1:1 program.  The SRO carefully reviewed the hearing record,
state regulations, and the private school programs in which the
Student was unilaterally enrolled immediately prior to this
dispute.[16]  He noted that the CSE Members had considered and
rejected placement of the Student in a 12:1:1, 8:1:1, or 6:1:1
special class without a 1:1 crisis management paraprofessional,
after finding that these classrooms were "insufficiently
supportive" for E.B.  Based on these and other considerations,
the SRO approved the IEP's 6:1:1 special class with the added
supports of a 1:1 paraprofessional.

   Both the law and the record support deference to the SRO
Decision.  State regulations provide that a 6:1:1 program is
specifically designed and recommended for students "requiring a

---

[16] These classrooms included an 8:1:4 ratio and a 10:1:6 ratio.

high degree of individualized attention and intervention."  8
N.Y.C.R.R. § 200.6(h)(4)(ii)(a).  In addition, in making this
recommendation, the CSE Members specifically considered that the
Student required a "smaller student-to-teacher ratio in order to
make progress and achieve his IEP goals."  The recommended
program included a 1:1 crisis management paraprofessional, as
well as additional services in which the Student would receive
1:1 attention, such as OT, PT, S/L therapy, and individual
counseling.

The plaintiffs claim that the SRO Decision improperly
discounts the testimony of their witnesses, N. Schwartz and C.
Schwartz, with respect to the 6:1:1 program in favor of
Fochetta's testimony.  The plaintiffs claim that testimony from
the Hearing suggests that Fochetta was unfamiliar with the
recommended program and the Student, and that her testimony
should not have been viewed as credible.

The record, however, demonstrates that Fochetta had
sufficient knowledge to assist in the recommendation process
during the CSE meeting, and thus that it was proper for the SRO
to find her testimony credible.  Fochetta testified that she was
unfamiliar with the specific 6:1:1 program at P94, but that CSE
teams make recommendations about "program[s] broadly . . . not
the specific school."  This statement does not demonstrate any

40

lack of knowledge about 6:1:1 programs generally.  Moreover,
Fochetta demonstrated knowledge of the benefits of 6:1:1
classrooms, testifying that she and the CSE Members felt that
the socialization aspect of a 6:1:1 class was particularly
important given E.B.'s significantly delayed social functioning.

In addition, as described above, the CSE Members used
written documentation as well as verbal input from the CTC staff
and M.C. during the CSE meeting to assess appropriate programs
for E.B.  While it is true that Fochetta never observed the
Student, the CSE Members had ample information to make an
appropriate recommendation for the Student designed to address
his academic, language, physical, social, and emotional needs.
In fact, the hearing record indicates that no one at the CSE
meeting disagreed with the recommendation of a 6:1:1 program
with 1:1 paraprofessional support at the time, including M.C.

3. P94 Placement

Finally, the plaintiffs contest the DOE's proposed
placement at P94, the school at which the Student's recommended
6:1:1 + 1:1 program would have been implemented.  The IHO did
not discuss this issue.  While the SRO also did not specifically
rule on the appropriateness of P94, the SRO considered the
Hearing record and described several benefits conferred by the
assigned school, including that P94 "provided differentiated

instruction according to the needs of a particular student, and
that the paraprofessionals in the classroom collaborated with
the special education teacher to assist in implementing lesson
plans, collecting data on student progress, and promoting
generalization."  The SRO also noted that the evidence
demonstrated that P94 "implemented a daily positive
reinforcement system" that would improve students' "emotional
literacy" and social skills, and would be able to offer the
program modifications and related services recommended in the
Student's IEP.

The plaintiffs' principal concern is that P94 does not
offer a classroom with instruction that matches the Student's
functioning levels.  During M.C.'s visit to the school, she
observed two classrooms, as well as the cafeteria and sensory
gym.  M.C. described one of the classrooms as consisting of
"severely impaired and nonverbal" students functioning below
E.B.'s levels, and the other class of students as functioning at
higher levels than E.B.  That the classrooms and other students
that M.C. observed at P94 do not exactly match E.B.'s level of
performance, however, does not render the placement
inappropriate under the IDEA.  A proposed classroom composed of
students with differing "intellectual, social, and behavioral
needs" can still be adequate so long as "a core group was

operating at an intellectual level sufficiently comparable to [the Student's] to permit [him] to continue making academic progress." Walczak, 142 F.3d at 133-34. Uniformity of needs is not required. Id. Moreover, the IDEA does not require school districts to provide the best possible placement, only an appropriate education which allows the child to receive a meaningful educational benefit. See Rowley, 458 U.S. at 199; T.P., 554 F.3d at 254.

Here, the record indicates that a P94 classroom taught by Maria Maraventano ("Maraventano"), a certified special education teacher who holds a master's degree in special education, would have been appropriate for the Student. The class consisted at the time of five autistic students, aged twelve to thirteen, with functioning levels ranging from pre-primer to fourth grade. At least one of these students would have operated at a level "sufficiently comparable" to that which the IEP described as the Student's abilities. The SRO also considered the Hearing record, which supports a finding that Maraventano adapts her lesson plans to the unique abilities and challenges of each student, and places her students into smaller groups for instruction based on their unique functioning levels. Maraventano testified at the Hearing that her classroom was equipped with its own sensory area, and that another teacher,

also certified in special education, assisted in her classroom,
as did another classroom paraprofessional with fourteen years of
experience.  Such differentiated instruction is conducive to
conferring an educational benefit, and the Student, accordingly,
would have been appropriately placed in this classroom.[17]

The plaintiffs finally contend that the DOE failed to meet
its burden in demonstrating that the P94 placement was
appropriate.  In particular, the Parents question whether
Maraventano in fact teaches a 6:1:1 classroom regularly, and
argue that the DOE presented imprecise evidence from individuals
with limited knowledge of the Student and the specifics of the
proposed placement.  These arguments fail, for several reasons.

First, Maraventano testified that she had taught a 6:1:1
class every summer, even if the summer program ran somewhat
differently than during the academic year.  Maraventano also
indicated that, while she did not participate at the CSE in
formulating the Student's IEP, she "carefully addresses
everything mandated in each student's IEP[,]" so that she can

---

[17] Whether M.C. actually observed this particular classroom is
irrelevant to this determination.  The record provides
sufficient evidentiary support of the DOE's appropriate
placement, and indicates that Maraventano's class was registered
and had space available for the Student at the beginning of the
2010-2011 school year.

properly tailor her teaching methods.  Nothing in the record indicates that Maraventano's testimony is not credible.

In addition, the fact that Maraventano did not know the total number of students enrolled in P94 or whether the school had a sensory gym does not render the DOE's recommended placement inappropriate; nor does the fact that Fochetta could not list the precise level of training obtained by the classroom paraprofessionals or individual crisis management paraprofessional at P94.  Fochetta reasonably indicated that there was variability with respect to the paraprofessionals' training and she should not be expected to have that information committed to memory.  Nothing in the record suggests that the fact that the DOE did not include every detail of the proposed placement at P94 impeded the Student's ability to progress and did not the render the IEP inadequate.[18]  Accordingly, the P94 school placement, as well as the IEP's goals and objectives, and the 6:1:1 program with a 1:1 paraprofessional, were sufficiently tailored to confer an educational benefit on the Student, and were not substantively inadequate.

_____

[18] The plaintiffs' assertion that "a paraprofessional would not have sufficient training to address E.B.'s behaviors" is not supported by any evidence on the record.

45

D. The Parents' Unilateral Placement and Equitable
   Considerations

This Opinion has found that the SRO correctly determined
that the DOE provided the Student a FAPE, and that the Parents
are not entitled to reimbursement for the Student's tuition at
CCC, or for Supplemental Services rendered from July 1, 2010
through June 30, 2011.  This Opinion therefore "need not reach
the issues whether the additional services provided by the
parents were appropriate, or whether equitable considerations
affect relief." T.P., 554 F.3d at 254.  In any event, the DOE
would prevail on these issues as well.

The Parents have not demonstrated that the Student's
unilateral placement at CCC is appropriate.  The record
indicates that the Student's unilateral placement at CCC is
overly restrictive, and only allows the Student to interact with
peers for approximately three of the thirty-five hours of CCC
services he receives per week.  CCC provides services to the
Student at his home, where there is no opportunity for
socialization, for two days per week, and it also requires over
two hours of travel on the three days per week that he does
attend the clinic.  The IEP reflects the Student's need for
social interaction, which CCC fails to provide.  CCC also does
not offer OT or PT services, both of which are recommended in
the Student's IEP.  In addition, although the Parents have

46

asserted that the Student progressed in all areas while attending CCC, the record indicates that CCC provides very little academic instruction, which was a primary and reasonable focus of the Student's IEP.  The plaintiffs also have not met their burden of establishing that the equities favor reimbursement.


CONCLUSION

The DOE's January 18, 2013 cross-motion for summary judgment is granted and the plaintiffs' December 14, 2012 motion for summary judgment is denied.  The Clerk of Court shall enter judgment for the defendant and close this case.


SO ORDERED:

Dated:    New York, New York
          August 19, 2013

_____
          DENISE COTE
    United States District Judge